In the Matter of the WELFARE OF
the CHILDREN OF J.B. and G.
A.-C., and T. F., Parents.

No. A04–973.

Court of Appeals of Minnesota.

March 30, 2005.

Leonardo Castro, Fourth District Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, MN, for appellant T.F.H.

Joseph Plumer, Bemidji, MN, for respondent White Earth Band of Ojibwe.

Shannon E. Smith, Minneapolis, MN, for respondent B.J.

Amy J. Klobuchar, Hennepin County Attorney, Mary M. Lynch, Assistant County Attorney, Minneapolis, MN, for respondent Hennepin County HSD/DCFAS.

Alan C. Thiel, Edina, MN; and Michelle Paninopoulos, Minneapolis, MN, for guardian ad-litem.

Considered and decided by TOUSSAINT, Chief Judge; HUDSON, Judge; and PORITSKY, Judge.

## OPINION

PORITSKY, Judge.**

Appellant-father T.F.H. challenges the termination of his parental rights, making various arguments regarding the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–63 (2000), procedural matters, evidentiary rulings, and appointment of counsel. Because the district court did not misapply the law, make findings unsup-

** Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

ported by the record, or otherwise abuse its discretion, we affirm.

## FACTS

J.B. (mother) is the mother of the three children who were the subject of this proceeding in district court. She is an Indian parent within the meaning of the Indian Child Welfare Act (ICWA). At the start of the proceeding, mother had custody of the three children. The youngest child (L.B.), who is the subject of this appeal, was born in February 1998. At some point during the proceedings, L.B. was formally enrolled as a member of the mother's tribe.

L.B.'s father (father) is also an Indian parent within the meaning of the ICWA, but belongs to a different tribe than mother. Father was adjudicated to be L.B.'s father in May 2000 and is the appellant in this proceeding. He has extensive histories in both the child-protection and criminal systems. The father of the two older children (G.A.C.) is not a party to this appeal.

In March 2001, the Hennepin County Department of Children and Family Services (the county) removed the children from mother's home because of her chemical-dependency and mental-health problems. The county also filed a petition alleging that all three children were children in need of protection or services (CHIPS). Mother admitted that the children were CHIPS in July 2001.

In October 2001, the county petitioned to terminate mother's parental rights due to her failure to substantially comply with her case plan. Notices were sent by registered mail to father, his tribe, and mother's tribe. Mother's tribe intervened, but the notice to father was returned "unclaimed," and, despite proof of service in the file, no response was received from father's tribe. Because mother had some

success with her case plan, her termination trial was continued, but in July 2002 she relapsed. Mother's continued termination trial was then set for March 24, 2003.

On March 21, 2003, the county petitioned to terminate the parental rights of both fathers. Notices were again sent to father, his tribe, and mother's tribe. Both fathers first appeared in court on March 24, 2003, the first day of mother's termination trial. Mother then moved to continue her trial based on the fact that the fathers had appeared, but the district court denied the motion and instead separated the proceedings so each of the three parents was to have a separate trial. Because mother admitted the allegations in the petition seeking to terminate her parental rights, the bulk of her trial addressed a petition that she had filed to have custody transferred to a member of her extended family, rather than whether to actually terminate her parental rights.

After mother's trial but before the district court ruled, the district court held an admit/deny hearing in father's proceeding, at which father stated he would move to reopen mother's proceeding and to reconsolidate his proceeding with mother's proceeding. The district court then stayed mother's proceeding pending father's motion. Father later made the motion, and, in August, the district court denied the motion and ordered termination of mother's parental rights, but stayed the termination, pending resolution of the proceedings involving the two fathers.

In September, father moved for reunification with the child and for a continuance of his termination trial. The district court denied these motions as untimely. Also in September, the county sought to file an amended termination petition regarding father, citing a 1997 termination of father's parental rights to another child, of which

the county stated it was previously unaware. The district court denied that motion, and father's termination trial started on September 22. At the trial, Andrea Keezer was called by mother's tribe, of which Keezer is a member, and testified as an expert. Father's trial ended on October 31. G.A.C.'s trial ended on December 2. In a single March 2004 order addressing mother and both fathers, the district court terminated the parental rights of all three parents.

Father sought a new trial. In doing so, he submitted documents from his tribe stating (a) the tribe did not receive notice of the proceedings; (b) under the practices of father's tribe, the child was automatically considered a member of that tribe; and (c) father's tribe thought the child should be returned to father. The district court denied father's posttrial motion stating, among other things, that father's submission of the documents from his tribe was untimely and hence that they did not entitle father to relief. Father appeals.

## ISSUES

1. Did the district court err by treating the child as a member of mother's tribe?

2. Did the district court err in ruling that Andrea Keezer was a qualified expert witness for purposes of ICWA?

3. Did the district court abuse its discretion by ruling that Keezer's testimony had adequate foundation?

4. Does the record support the district court's determination that the county made the active efforts to avoid the breakup of the Indian family required by 25 U.S.C. § 1912(d) (2000)?

5. Did the district court deprive father of his rights to participate in mother's termination trial?

6. Was father's tribe given adequate notice of the termination proceedings?

7. Did the district court abuse its discretion in its evidentiary rulings?

8. Did the district court abuse its discretion by denying father's motions for a continuance?

## ANALYSIS

In Minnesota courts, proceedings to terminate parental rights to an Indian child must comply with the Indian Child Welfare Act (ICWA). Minn.Stat. § 260C.001, subd. 3 (2004).

### I

■ In a proceeding to terminate parental rights to an Indian child, ICWA requires that the petitioning party show beyond a reasonable doubt that "active efforts" were made to prevent the breakup of the Indian family and that those efforts were unsuccessful. 25 U.S.C. § 1912(d) (2000) (requiring active efforts); *In re Welfare of M.S.S.*, 465 N.W.2d 412, 418 (Minn.App.1991) (requiring proof of active efforts beyond reasonable doubt).

The district court treated mother's tribe as the child's tribe, despite the fact that at the beginning of these proceedings, the child was eligible to be a member of both father's tribe and mother's tribe. On appeal, father argues that identifying the child's tribe could have a significant impact in determining whether the "active efforts" to reunify the family were made and that the district court should have identified the child's tribe by determining with which tribe the child had more significant contacts. *See* 25 U.S.C. § 1903(5)(b) (2000) (stating, if Indian child is "a member of or eligible for membership in more than one tribe," "Indian child's tribe" is tribe with which child "has the more significant contacts"); Guidelines for State Courts—Indian Child Custody Proceedings, 44 Fed. Reg. 67,584; 67,586 (Nov. 26, 1979) [here-

inafter BIA Guidelines] (stating in section B.2.(a), if child is member of more than one tribe "or is eligible for membership in more than one tribe, but is not a member of any of them, the court is called upon to determine with which tribe the child has more significant contacts" and listing in section B.2.(c) factors to be considered "[i]n determining which tribe shall be designated the Indian child's tribe"). But father admits that "at some point," the child was enrolled in mother's tribe. And the BIA Guidelines state that if a child becomes a member of a tribe during the proceeding, "that tribe shall be designated as the Indian child's tribe with respect to all subsequent actions related to the proceeding." BIA Guidelines, *supra,* § B.2.(e). Also, the commentary to that guideline states that "the guidelines make actual tribal membership of the child conclusive on this issue." *Id.,* cmt. B.2. Thus, because the child's enrollment in mother's tribe required the district court to treat mother's tribe as the child's tribe, the district court was correct in doing so.

 Father argues that the district court should have allowed him to inquire into his ability to un-enroll the child from mother's tribe and enroll the child in his tribe. Because he cites no authority allowing or addressing un-enrollment, the argument is not properly before us. *See State, Dep't of Labor & Indus. v. Wintz Parcel Drivers, Inc.,* 558 N.W.2d 480, 480 (Minn. 1997) (declining to address issue absent adequate briefing); *Midway Ctr. Assocs. v. Midway Ctr., Inc.,* 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975) (requiring party to show error and prejudice to prevail on appeal). Moreover, even if the argument had been properly raised, it is unpersuasive. The purpose of the ICWA is to "protect the best interests of Indian children and to promote the stability and security of Indian tribes." *Desjarlait v. Desjarlait,* 379 N.W.2d 139, 144 (Minn.App. 1985) (quotation omitted), *review denied* (Minn. Jan. 31, 1986). A child's best interests are presumptively served by putting the child in a stable environment. *Westphal v. Westphal,* 457 N.W.2d 226, 229 (Minn.App.1990). Allowing L.B. to be unenrolled from mother's tribe and enrolled in father's tribe would not promote the stability of L.B.'s environment and hence not promote her best interests, nor would it promote the stability of the mother's tribe.

## II

 Parental rights to an Indian child cannot be terminated absent testimony by a qualified expert that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (2000). Mother's tribe called Andrea Keezer, a member of mother's tribe, to testify as an expert, and the district court allowed her to testify as an expert. Father asserts that the court erred in admitting Keezer's testimony. His first argument in this respect is that the court admitted her testimony without assessing her qualifications as an expert witness.

 Generally, whether a witness qualifies as an expert is an issue within the discretion of the district court. *Gross v. Victoria Station Farms, Inc.,* 578 N.W.2d 757, 760 (Minn.1998). In ICWA cases, however, the issue is controlled in large part by the Tribal/State Agreement on Indian Child Welfare.[1] Tribal/State Indian Child Welfare Agreement, Minn. Dep't

---

1. The Agreement is based on the United States Department of the Interior, BIA Guidelines, *supra.*

of Human Servs. Bulletin # 99–68–11 (Aug. 25, 1999) [hereinafter Agreement] (full text of agreement appended to bulletin). The Agreement provides in part that (a) the designation by a child's tribe that a witness is an expert "is not subject to challenge by [the Department of Human Services (DHS)]"; (b) tribes may use qualified experts on a case-by-case basis or maintain a list of qualified experts; and (c) tribes participating in the Agreement are required to keep a list of tribally-approved qualified experts. *Id.* at 16. The Agreement defines "qualified expert witness" as a person who is "a member of the Indian child's tribe, who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and child rearing practices...." *Id.* at 9; *see* BIA Guidelines, *supra* (reciting in section D.4.b.(1) similar definitions); Dep't of Human Servs. Manual XIII–3521 § 28 (1991) (same).

Here, the district court noted that mother's tribe designated Keezer as an expert, and stated that under the Agreement, the court lacked the ability to second-guess that designation. Father argues that DHS's inability to challenge the designation of the witness as an expert does not preclude the court from ruling that Keezer is not a qualified expert. But Keezer testified that she is an enrolled member of the tribe, is recognized by the tribe as being knowledgeable about the tribe's child-rearing practices, is authorized to testify on behalf of the tribe in cases involving out-of-home placement of enrolled children generally, has done so on "numerous occasions," and is specifically authorized by the tribe to speak on its behalf regarding this child in this proceeding. Thus, regardless of whether or not the Agreement allows entities other than DHS to challenge a tribe's designation of a person as an expert, Keezer's testimony is overwhelmingly clear that she qualifies as an expert witness under the Agreement, and the court was therefore correct in qualifying her as an expert to testify in this proceeding.

■ Because the district court correctly ruled that Keezer qualified as an expert witness, Keezer could give opinion evidence as contemplated by Minn. R. Evid. 702. Qualifying a witness as an expert, however, does not require the court to admit any and all testimony from that witness, nor does it require the court to find such testimony persuasive. The weight to be given any testimony, including expert testimony, is ultimately the province of the fact-finder. *In re Objection to Real Prop. Taxes*, 353 N.W.2d 525, 534 (Minn.1984); *In re Paternity of B.J.H.*, 573 N.W.2d 99, 104 (Minn.App. 1998). As the trial court correctly noted in its posttrial order, "[w]hile the Court acknowledges the Tribe's right to designate a representative to present expert testimony, the Court will determine the weight to be given the testimony based on the examination of the expert witness." Thus, even though the court qualified Keezer as an expert witness as mandated by the Agreement, the court properly allowed father the opportunity to cross-examine her concerning the merits of the case.[2]

2. Father notes that he was not privy to the deliberations of mother's tribe designating Keezer as an expert and asserts that he was "surely entitled to inquire into her expertise." As noted, above, however, Keezer's testimony qualifies her as an expert for purposes of this case. Moreover, we decline, at this time, to adopt an argument that assumes that a district court is better able than the tribe to identify who is an expert on tribal practices. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 194 n. 5, 119 S.Ct. 1187, 1199–1200 n. 5, 143 L.Ed.2d 270 (1999) (stating "[Indian] treaties are to be interpreted liberally in favor of the Indians, ... and

## III

In addition to his argument that the district court erred in qualifying Keezer as an expert, father makes a number of other claims that the court erred in admitting her testimony. He argues that Keezer's testimony both about her expertise and on the merits should not have been accepted because the testimony was "conclusory." But father does not allege that any of Keezer's testimony was false or incorrect. And because the substance of Keezer's testimony was within the area of her expertise, father was not prejudiced by the county's method of showing that expertise. In any event, if father felt that Keezer's testimony was too conclusory, he was given the opportunity to probe behind those conclusions in cross-examination. Thus, even if there were an error in accepting Keezer's testimony, the error is not reversible. *See Uselman v. Uselman,* 464 N.W.2d 130, 138 (Minn.1990) (stating evidentiary ruling is reversible only if district court abused its discretion in manner resulting in prejudice to objecting party); *see also In re Welfare of S.R.A.,* 527 N.W.2d 835, 838 (Minn.App.1995) (concluding that admission of certain evidence in termination-of-parental-rights proceeding was harmless), *review denied* (Minn. Mar. 29, 1995).

Father further argues that the substance of Keezer's opinion testimony addressing the merits of the case was not admissible because (1) it lacked foundation and (2) was based on hearsay. As to foundation, father does not allege that any of the sources of information Keezer used to form her opinions are atypical bases for those opinions, and reports from social workers and psychologists, like those used here, have been admitted as business records in juvenile-protection cases. *See In re Welfare of Brown,* 296 N.W.2d 430, 435 (Minn.1980); *In re Welfare of J.K.,* 374 N.W.2d 463, 467 (Minn.App.1985), *review denied* (Minn. Nov. 25, 1985). The issue of whether Keezer's opinions were based on an adequate foundation lies within the discretion of the district court, and we conclude that the court did not abuse its discretion in ruling that the foundations were sufficient.

Father also argues that "[e]xpert testimony must also be based upon actual perception, the witness's firsthand knowledge." He cites Minn. R. Evid. 602 and argues that an "opinion is inadmissible [if] it is not based upon first-hand knowledge." But father fails to note the last sentence of rule 602, which reads: "This rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses." Rule 703 states that if facts underlying an expert's opinion are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," those facts "need not be admissible in evidence." Minn. R. Evid. 703(a). Father cites *Ray v. Miller Meester Advertising, Inc.,* 664 N.W.2d 355 (Minn.App.2003), but that case does not support his argument. Instead the case says, "[t]he Minnesota Rules of Evidence provide that *a lay witness* may testify only to matters about which the witness has firsthand knowledge." *Id.* at 362. (Emphasis added.) Father's argument in this respect is contrary to the well-established evidentiary law, and the district court did not err in admitting Keezer's testimony, even though some of the information on which Keezer relied is hearsay.[3]

treaty ambiguities to be resolved in their favor" (citations omitted)).

**3.** A similar analysis applies to, and disposes of, father's argument that the district court should not have admitted the testimony of the child's therapist because it was based on doc-

Father's arguments in connection with Keezer's testimony all go to challenging its admissibility. It is not clear to us that he is making an independent argument that the testimony, once admitted, is insufficient to meet the requirement of section 1912(f) of the ICWA.[4] However, in support of his argument that the district court erred in permitting Keezer to offer an expert opinion, the father says in passing, "[Keezer's] testimony raises on appeal, not only the issue of sufficiency of the evidence to support HSD's adjudicatory burden in termination cases, but also significant violations of both state evidence law and of the ICWA." There is no further discussion of the issue of sufficiency apart from father's arguments concerning its admissibility. However, given the reference to sufficiency quoted above, we choose to address the issue.

■■■ As we have noted, Section 1912(f) of the ICWA mandates that before a court can terminate the rights of an Indian parent, the decision to terminate must be "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." Keezer was examined by all parties, including father. She testified that she had discussed this case with the Indian Child Welfare Office of the mother's tribe. Keezer reviewed aspects of father's relationship with the child and reported that mother's tribe did not consider father's parenting to be acceptable to the tribe. She reported the tribe's conclusion that "serious emotional or physical damage would result—damage to the child would result from being placed with [father]" and that the tribe further concluded that "it [was] in the best interests of [the child] that [father's] parental rights be terminated." On cross-examination by father, Keezer testified, "it's in the best interests of [the child] to not be in [father's] care." We conclude that based on the expert testimony of Keezer and entire record, including the father's lengthy criminal history, his problems with alcohol, his demonstrated lack of ability to parent his children, and his spotty relationship with the child, the district court was correct in concluding that there is evidence beyond a reasonable doubt that (1) it is in the best interests of the child that father's parental rights be terminated and (2) custody of the child by father is likely to result in serious physical or emotional damage to the child, within the meaning of section 1912(f) of the ICWA.

**IV**

■■■ Father argues that the district court erred when it ruled that 25 U.S.C. § 1912(d) did not require the county to

---

uments the therapist reviewed, rather than the therapist's personal knowledge.

4. In his brief, Father argues that the district court erred when it "permitted Ms. Keezer to offer *an expert opinion which met the adjudicatory requirements of § 1912(f) of the ICWA* but without meeting the admissibility requirements of expert testimony under Minnesota law." (Emphasis added.) The guardian ad litem, quoting father's brief, argues, "Indeed [the father's] brief concedes that Ms. Keezer's expert opinion 'met the adjudicatory requirements of § 1912(f) of ICWA,' " which appears to be a fair reading of father's position. In an apparent attempt to correct any misreading of his position, father states in his reply brief, "[Father] *never* conceded that witness Keezer qualified as an 'Indian expert witness.' In the cited passage of his brief, [father] described only the purpose for which Ms. Keezer's testimony was offered." (Italics in original.) Father's response challenges Keezer's ability to testify as an expert, which is consistent with his challenge to the *admissibility* of her testimony. It says nothing about the *sufficiency* of her testimony, once the court admitted it.

prove that it considered placement of the child with father's extended family. The district court essentially found that father intentionally avoided participation in these proceedings; it stated that he did not participate until 2003, despite having "actual notice of the child's placement in foster care well before 2003." Thus, the district court ruled that father's proffered reasons for his lack of prior participation in the proceeding were not credible, and we defer to that determination. *See In re Welfare of M.D.O.*, 462 N.W.2d 370, 374–75 (Minn. 1990). Moreover, father does not explain how the county was supposed to investigate father's family absent timely responses from father and his tribe.

Father further argues that the issue is controlled by this court's decision in *In re Welfare of M.S.S.*, 465 N.W.2d at 417–19, and maintains that the district court erred in its reading of 25 U.S.C. § 1912(d) because it improperly deferred to placement decisions made by mother's tribe when those decisions "were made in 2001, most likely before [father's tribe] and [father] were ever notified of these proceedings." But *M.S.S.* is distinguishable. There, this court reversed and remanded a termination where the proposed custodians were not identified until after trial started, but were specific members of the child's tribe who were licensed foster parents and recommended to be custodians by the child's tribe. This court stated "we do not believe the reasonable doubt standard [for the active-efforts requirement] could have been met without consideration of [father's] alternative plan[,]" and that if the child could be placed with the proposed custodians, "the need for terminating [the father's] parental rights might be obviated." *M.S.S.*, 465 N.W.2d at 419. Here, however, the proposed custodian specifically identified by father was found not credible, other proposed custodians were not identi-

fied, and the child's tribe did not endorse the placement father proposed.

Father also argues that he was not given enough time to work on his case plan and that aspects of his case plan were inadequate. He admits, however, "some of the delay surely was [his] fault because of his desire to remain [with his tribe in South Dakota]." Also, the district court found that father (a) avoided participation in the proceedings; (b) "imposed the unreasonable requirement" that other services offered to him "needed to be done only on Fridays"; (c) refused transportation assistance when his car broke down; (d) testified that he did not need parenting assistance to parent the child; and (e) "rejected" the "services available to [father] in his area . . . for various reasons." Father does not challenge these findings. Thus, we affirm the ruling that the "active efforts" were provided to father, but that those efforts were unsuccessful.

## V

Father challenges what he alleges was the district court's refusal to treat him as a party to the proceeding to terminate mother's parental rights and its "failure" to immediately appoint counsel for him in that proceeding. He argues that, as the child's parent, he had "rights" to participate in the proceeding to terminate mother's parental rights by testifying, offering evidence, examining witnesses, and insisting that members of his family be considered as placement alternatives. Although it is clear that father is correct to the extent he asserts that he was a party to mother's termination proceeding, Minn. R. Juv. Protect. P. 21.01, subd. 3(a), the district court's findings in its posttrial order show that the factual assumptions on which father bases the rest of his arguments are incorrect. The district court did appoint counsel for father, and the

posttrial order states (a) the district court "never" held that father was not a party to mother's proceeding; (b) father "has always had a right to be present at all permanency proceedings and have counsel appointed for him"; (c) father was not "present or available" for participation in mother's proceeding; (d) the public defender has a "policy" of not accepting a case "unless the person they are being appointed to represent is physically present"; (e) regardless of that policy, "an attorney, as a representative of a party, cannot, without active direction from the client, begin to know what the client's desires or wishes are regarding the case"; and (f) father's lack of representation during mother's proceeding "was due to his non-appearance, not … due to the [c]ourt choosing within its discretion to not appoint an attorney for him." This record supports these findings, and they adequately explain the district court's handling of father's status during mother's proceeding.

Alleging that the motion to bifurcate mother's proceeding from father's proceeding was made without notice to father and before father had counsel, father argues that the bifurcation improperly precluded him from active participation in mother's trial. This argument assumes that father's nonparticipation was for reasons other than his own refusal to participate in the proceeding. Because father initially chose to avoid participating in the proceedings, the district court did not abuse its discretion by bifurcating mother's proceeding from father's proceeding and allowing mother's proceeding to proceed in a timely fashion. *See Steinbrecher v. McLeod Coop. Power Ass'n*, 392 N.W.2d 709, 715 (Minn.App.1986) (stating district court's decision to grant separate trials will not be disturbed absent abuse of its wide discretion).

## VI

 Under ICWA, notice of termination proceedings must be by registered mail or another method listed in the statute. 25 U.S.C. § 1912(a) (2000). Here, the district court found that father's tribe received "appropriate notices of these proceedings." Father assumes that this finding is based on exhibits 54 and 55, and argues that the district court should not have admitted these exhibits. But regardless of whether those exhibits should have been admitted, the district court file contains an October 10, 2001 "ICWA NOTICE FOR TRANSFER OF LEGAL CUSTODY/TERMINATION OF PARENTAL RIGHTS[,]," and an April 21, 2003 "ICWA NOTICE FOR TERMINATION OF PARENTAL RIGHTS[.]" Attached to each notice is an affidavit showing service of the notice by registered mail on father's tribe. Thus, at the time of trial, the record showed that father's tribe had been served.

 Father argues that the April 2003 notice is defective because it was untimely for the hearing mentioned in that notice and because the hearing did not actually occur on the date listed in the notice. But because these questions are raised for the first time on appeal and father does not allege any prejudice as a result of the purportedly defective notice, we do not address these questions. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (stating, generally, appellate courts do not address issues not presented and considered by district court); *Midway*, 306 Minn. at 356, 237 N.W.2d at 78 (requiring party to show error and prejudice to prevail on appeal).[5]

---

5. While father's brief argued that the October 2001 notice regarding transfer of custody was

Father also cites the posttrial documents from his tribe indicating that it did not receive the notices sent to it, and he argues that his tribe could have rendered termination unnecessary if it had intervened, assisted father with his case plan, and helped locate a member of father's family that could have cared for the child. But the posttrial submissions from father's tribe suggest that its ability to provide the services father required is limited. Moreover, if the tribe believes its notice was fatally defective, it can petition to "invalidate" the termination under 25 U.S.C. § 1914 (2000).

## VII

■ Father challenges several additional evidentiary rulings. Evidentiary rulings are discretionary with the district court and require reversal only if the objecting party shows both that the ruling was an abuse of discretion and that it prejudiced the objecting party. *Uselman,* 464 N.W.2d at 138.

■ Father argues that exhibit 24, a 2001 document regarding his repayment of expenses associated with the child placement, should not have been admitted because it was not relevant to a termination of parental rights, was stale, and lacked foundation. But exhibit 24 was admitted to show the county's efforts to notify father of the child's out-of-home placement. Therefore, it was relevant to the notice issue.

Father also argues that exhibit 41, a 2003 recommendation that he receive alcohol treatment, should not have been admitted because it was incomplete and lacked foundation. Any error in admitting exhibit 41 is harmless in light of the overwhelming

evidence supporting the district court's findings, generally, and the evidence supporting the district court's treatment of father's alcohol-related problems, specifically.

■ Father argues that exhibit 42, a report by the child's therapist that was not entirely favorable to father, should not have been admitted because it was cumulative, lacked adequate foundation, and was inconsistent with testimony from one of father's witnesses. But erroneous admission of evidence that is cumulative of other admissible evidence is "harmless and will not warrant a new trial." *W.G.O. ex rel. Guardian of A.W.O. v. Crandall,* 640 N.W.2d 344, 349 (Minn.2002). Also, experts are allowed to render opinions on ultimate issues. Minn. R. Evid. 704. And here, the record shows an adequate basis for the therapist's opinions. Further, the existence of contrary evidence does not render the report inadmissible, especially where, as here, the district court found not credible the father's rebuttal witness. *See M.D.O.,* 462 N.W.2d at 374–75 (noting appellate deference to district-court credibility determinations). To the extent father objects to the district court allowing the therapist to testify as an expert, we reject that argument: The record contains adequate evidence to allow the therapist to testify as an expert regarding this child. *See Gross,* 578 N.W.2d at 761 (stating appellate courts apply a "very deferential standard" to district-court determinations of whether witness is treated as expert and will reverse only if district court clearly abused its discretion).

■ Father challenges the admission of evidence of his extensive criminal history, arguing that it is more prejudicial than

---

defective, at oral argument, father's attorney conceded that even if that notice was defective, it would not render fatally defective the

termination decision at issue in this appeal. We appreciate counsel's candor on this point.

probative. But the fact that father has criminal convictions dating back to 1983, coupled with his recent convictions for alcohol-and chemical-related offenses, show that he still has a long-standing problem remaining lawabiding. And the district court's finding that "during his testimony, [father] appeared to find his criminal history humorous and exhibited no remorse or regret for his actions but seemed to regard his criminal past with pride," does not suggest father is likely to change his behavior soon. The district court did not abuse its discretion by admitting the evidence of father's criminal history.

## VIII

■ Father argues that the district court abused its discretion by denying his motions for a continuance because he was allowed only a short period of time to complete his case plan. *See In re Welfare of J.A.S.*, 488 N.W.2d 332, 335 (Minn.App. 1992) (applying abuse of discretion standard of review to continuance ruling), *review denied* (Minn. Oct. 20, 1992). But father would have had additional time if he had not earlier avoided participating in the proceedings. Also, the time he was given could have been of greater use to him if he had not refused the services he was offered via his case plan.

## DECISION

Because the child was enrolled in mother's tribe during these proceedings, the district court correctly treated the child as a member of mother's tribe. The district court did not abuse its discretion in ruling Andrea Keezer to be an expert witness for ICWA purposes, or in accepting her testimony. Father's failure to timely participate in the proceedings and the unreasonable restrictions he put on his receipt of proffered services render defective his argument that the county failed to make the active efforts to avoid the breakup of the Indian family required by 25 U.S.C. § 1912(d) (2000). For similar reasons, the district court did not deprive father of his right to participate in the trial regarding the termination of mother's parental rights. Also, any errors in the district court's evidentiary rulings are, on this record, harmless. And the district court did not abuse its discretion by denying father's motions for continuances.

**Affirmed.**